**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO.:  9:12-cv-81271-RYSKAMP/HOPKINS**

**FORTILINE, INC., d/b/a FORTILINE**
**WATERWORKS, a South Carolina corporation,**

      **Plaintiff,**

**vs.**

**DANIEL B. MOODY, an individual, AVEM**
**HOLDINGS, LLC, a Florida limited liability**
**company, AVEM SUPPLY, LLC, , a Florida**
**limited liability company, and TODD J.**
**WITTERMAN, an individual,**

      **Defendants.**
_____/

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff Fortiline, Inc. ("Fortiline" or "Plaintiff"), by and through its undersigned counsel, respectfully moves this Court to issue a Temporary Restraining Order and Preliminary Injunction in accordance with Rule 65 of the Federal Rules of Civil Procedure, against Defendants Daniel B. Moody ("Moody"), AVEM Holdings, LLC ("AVEM Holdings"), AVEM Supply, LLC ("AVEM Supply") and Todd J. Witterman ("Witterman") (collectively, "Defendants"), and in support of this Motion states as follows:

    1.    Prior filing this Motion, Fortiline has filed a six (6) count Verified Complaint (Dkt. 1).

    2.    As stated in the Verified Complaint, Defendants have (1) misappropriated, and are currently misusing and converting to personal use and gain, Fortiline's trade

secret and confidential business information (including client information and client lists); (2) wrongfully removed large amounts of proprietary data from Fortiline's computers and servers; and (3) tortiously interfered with Fortiline's advantageous business and contractual relationships with customers, vendors and referral sources.

3.      Fortiline has requested the return of its confidential information and computer files on multiple occasions, to no avail.

4.      Under these circumstances, absent the imposition of a Temporary Restraining Order, Fortiline is suffering and will continue to suffer irreparable harm to its legitimate business interests, including but not limited to, loss of clients, unauthorized disclosure of its confidential business information, loss of goodwill, and continued damage to its reputation.  Defendants, on the other hand, will not be unnecessarily restricted from working; they will merely be constrained from harming Fortiline with the use of information wrongfully misappropriated by Defendants Moody and Witterman during and after their employment with Fortiline.

5.      Fortiline has no adequate remedy at law.  As such, it is imperative that Fortiline obtain the intervention of this Court, at least temporarily, until expedited discovery can be conducted and a full hearing held on Fortiline's request for Preliminary Injunction.

6.      Fortiline is substantially likely to succeed on the merits of its claims against Defendants, and issuance of injunctive relief will serve the public interest because such relief will be consistent with Florida statutory and common law concerning the sanctity of private, trade secret client information.

7.      No bond, or minimal bond, should be required, because Defendants will

not suffer any legitimate and measurable damage by ceasing their use of confidential and proprietary business information which they are not entitled to under the law. Therefore, if the Court determines that a bond is necessary, it should not exceed $1,000 for each Defendant.

8.     For the foregoing reasons, Fortiline respectfully requests that this Court grant this Motion and enter a Temporary Restraining Order and Preliminary Injunction containing the following terms:

A.     Defendants be restrained and enjoined from using and/or disclosing Fortiline's confidential business information and/or trade secrets;

B.     Defendants be retrained and enjoined from soliciting, or continuing to service, any of Fortiline's clients with whom Defendants were engaged or to whom Defendants provided services while Defendants were employed with Fortiline;

C.     Defendants be restrained and enjoined from otherwise engaging in conduct that interferes with the advantageous business relationships between Fortiline and its clients;

D.     Defendants be required to return any Fortiline information in their possession;

E.     Defendants be required to preserve any electronic information, including but not limited to, any confidential information business information belonging to Fortiline and/or electronic files taken from Fortiline's premises and/or servers; and

F.     An award of such other relief that this Honorable Court may deem just and proper.

## <u>SUPPORTING MEMORANDUM OF LAW</u>

### I.     FACTUAL BACKGROUND[1]

Fortiline is in the business of distributing underground utility products for installation in both the public and private sectors.  Dkt. 1 at ¶ 12.  In the course of its business, Fortiline has developed and maintained confidential information regarding its innovations, software, Trade Secrets, business plans, financial strategies, finances, including, without limitation, information regarding Fortiline's financial condition, results of Fortiline's operations, identities of clients or prospective clients, vendors, referral sources, products under development, acquisition strategies and acquisitions under consideration, pricing or cost information, marketing strategies, passwords and codes, formulae, patterns, compilations, programs, devices, methods, techniques, and processes (hereinafter collectively referred to as "Confidential Information").  *Id.* at ¶ 13.  This Confidential Information is highly proprietary, was developed over a substantial period of time, and is the product of great expense and effort.  *Id.*  It is not available to the public or to others in the industry, and would be of great value to Fortiline's competitors.  *Id.*

Fortiline's Confidential Information has been the subject of reasonable efforts to maintain its confidentiality.  *Id.* at ¶ 14.  Among the methods employed to maintain this confidentiality have been the use of computer passwords; instructing its employees that any and all documents, records, notebooks, plans, models, components, devices, computer software or codes, discs or electronically stored items containing such Confidential Information is proprietary; and providing in its employee handbook and corporate policies that disclosure and use of Confidential Information is prohibited.  *Id.*

---

[1] In support of this motion, Plaintiff relies on and incorporates Plaintiff's Verified Complaint (Dkt. 1), filed herewith.

### A.      Employment Histories of Moody and Witterman

Fortiline hired Defendant Moody in 2008 as the International Division Manager, tasked with managing all of Fortiline's international sales. *Id*. at ¶ 15. In 2009, at Moody's request, Fortiline hired Witterman as an inside salesperson, working directly for Moody. Witterman resigned in January of 2011 but was rehired by Fortiline, at the insistence of Moody, as an Estimator in January of 2012. *Id*. at ¶ 16.

Moody and Witterman, as Plaintiff's employees, had access to and direct knowledge of Plaintiff's Confidential Information and Trade Secrets. *Id*. at ¶ 17. Moody and Witterman abruptly resigned on or about November 9, 2012, announcing that they were starting a new venture. *Id*. at ¶ 18. After his resignation from Fortiline, Moody began to openly do business as AVEM Holdings and AVEM Supply, in direct competition with Fortiline. *Id*. at ¶ 19.[2] On November 7, 2012, an announcement was posted on the AVEM Supply website (www.avemsupply.com) indicating that Witterman was its new VP of Operations. *Id*. at ¶ 21.

On or about November 12, 2012, Moody returned his company-owned laptop with all of the data wiped from it. *Id*. at ¶ 22. Fortiline determined that, prior to deleting all of the data and files from the laptop, Moody transferred some or all of the data and files to an external storage device. *Id*. at ¶ 22. Moody also failed to return any of Fortiline's paper files which were in his possession at the time he resigned. *Id*. at ¶ 24. Witterman returned his company-owned laptop with all e-mails from 2012 deleted. *Id*. at ¶ 25.

Upon information and belief, both prior to and after resigning from Fortiline, Moody sent e-mails to many Fortiline customers telling them that he was leaving Fortiline and that

---

[2] The Florida Department of State Division of Corporations' records show that Moody actually joined AVEM Holdings on or about March 31, 2011[2] and formed AVEM Supply on October 15, 2012. *Id*. at ¶ 20.

he was beginning his own competing business, AVEM Holdings and AVEM Supply.  *Id*. at

¶ 26.   After Witterman employment was terminated, Fortiline discovered that Moody

solicited Witterman to join Moody in his new venture, and quit his job at Fortiline, while

both Moody and Witterman were still employed by Fortiline.  *Id*. at ¶ 27.

      On November 12, 2012, Moody sent the following e-mail to everyone on the

proprietary contact list he misappropriated from Fortiline:

> **From:** Danny Moody - AVEM Supply [mailto:danny.moody@avemsupply.com]
> **Sent:** Monday, November 12, 2012 11:35 AM
> **To:** Danny Moody - AVEM Supply
> **Subject:** Danny Moody - Introduction to AVEM Supply
>
> Good morning,
>
> Over the past five years, I have had the great privilege of working with
> so many of you. I wanted to let each of you know that last week, I
> stepped down from the company I served for those years as
> international division manager. The exciting news is that myself and a
> select team of individuals has formed a distributorship model designed
> to focus on improving the overall material supply experience. AVEM
> Supply is a distribution company delivering product solutions for:
> contractors, developers and municipalities operating in the: utility,
> roadway, sitework and heavy construction industries. We provide
> products for waterworks, treatment plant, gas, electric, safety, road and
> equipment. AVEM Supply was founded and operates on four
> fundamental values: Trust, Strength, Reliability and Integrity. I am
> excited to continue the relationships that I have made with each of you
> in this new endeavor. Please feel free to contact me regarding any
> specific information that we need to review in order to conduct
> business together.
>
> Below is the contact information for our office. You may also call
> myself or TJ Witterman directly on our cell phones. Please note that
> my cell phone # has not changed. **<u>Also note that any previous e-mail
> addresses that you had for either TJ or myself have been
> disconnected and will not work.</u>**
>
> New contact information:
>
> Office Address:      1003 Jupiter Park Lane #2
>                        Jupiter, FL 33458

| | |
|---|---|
| Office Phone: | 561-459-1239 |
| Office Fax: | 561-348-2388 |
| | |
| Danny Cell: | 561-719-3433 |
| TJ  Cell: | 561-568-9258 |
| | |
| Danny e-mail: | danny.moody@avemsupply.com |
| TJ e-mail: | tj.witterman@avemsupply.com |
| | |
| Website: | www.avemsupply.com |

We look forward to hearing from each of you soon.

Danny Moody
President

**AVEM SUPPLY**
O: 561.459.1239 / C: 561.719.3433 / F: 561.348.2388
www.avemsupply.com

*Id.* at ¶ 28.

> **B.**     **Fortiline's Loss of Confidential and Vital Business Data**

Both Moody and Witterman erased voluminous data from their laptops before returning them to Fortiline.  *Id.* at ¶ 29.  Thus, on or about November 15, 2012, Fortiline began to investigate the e-mails, data and files that it was able to access with assistance of its IT personnel, in an effort to determine the extent of the harm caused by Moody and Witterman.  *Id.* at ¶ 30.

The server directory used by Moody and Witterman is called "International-G" and is housed on the D: Drive of a server at Fortiline's data center in Greensboro, North Carolina. *Id.* at ¶ 31.  In October and November of 2012, Moody and Witterman were the only members of the "International-G" group and were the only employees with access to this resource, other than network administrators.  *Id.* at ¶ 31.  Fortiline determined that a large amount of data had been deleted from its server on or about October 25, 2012.  *Id.* at ¶ 32.

On November 11, 2012, Fortiline's IT Operations Manager David Burns ("Burns") used a backup tape to find data prior to October 25, 2012 that could be used for file recovery, and determined that the full backup set from October 22, 2012 was the oldest and most complete data set available.  *Id*. at ¶ 33.  Burns restored that data to a folder called "International-Recovered-10-22-2012".  *Id*. at ¶ 33.  That recovered folder contains 4,022 files in 1550 folders and amounts to about 858 MB of data.  *Id*. at ¶ 33.  None of this data appears after October 25, 2012.  *Id*. at ¶ 33.  The abrupt disappearance of this large volume of data between Monday, October 22nd and Thursday, October 25th, 2012 was never reported by the Moody or Witterman to anyone in Fortiline's IT Department.  *Id*. at ¶ 33.  Therefore, it appears to be an intentional destruction, and likely theft, of Fortiline property.  *Id*. at ¶ 33.

While employed by Fortiline, Moody and Witterman used Microsoft Access Databases to track all of their customers and transactions.  *Id*. at ¶ 34.  Those files are also substantially missing from Plaintiff's system and appear to have been removed from the server for a considerable period of time prior to October 22, 2012.  *Id*. at ¶ 34.  Moody and Witterman misappropriated all of Fortiline's information on its international sales, leaving it completely unable to continue that business.  *Id*. at ¶ 35.

On November 9, 2012, Mike Swedick, Fortiline's Vice President of Sales, sent Moody a text message telling him to return his company car and computer to Fortiline's Port Saint Lucie office.  *Id*. at ¶ 36.  Swedick also told Moody he needed to know who deleted all the international files from Fortiline's computers.  *Id*. at ¶ 36.  Moody stated that "[a]ll files are backed up on the hard drive of my computer.  You will have everything that was stored on the RDP server."  *Id*. at ¶ 36.  When Swedick asked Moody why the files were deleted in the first place, Moody said "those files are simply shipping invoices that are generated out of

Mincron.  I did not do it for any other purpose than to move them into the hard drive so everything was in one convenient place.  They are right on the desktop.  Having old shipping documents and letters of instruction are not anything that we are going try to use against anyone.  Also you will find the backup PDFs of my e-mails in the same folder." *Id*. at ¶ 37.  However, Fortiline does not have access to any of the files Moody mentioned as everything was wiped from his company laptop twice before it was returned.  *Id*. at ¶ 37.

In the same conversation, Moody also told Swedick that "[w]hen the final decision was made about 10 days ago, some comments were made about 'taking care' of information.  I believe that it was due to emotions and irrational thinking.  Rather than allow the temptation to fester, I made the decision to take the server down and store it on my computer to avoid anything else happening that could have been out of my control.  I am fully responsible for pulling the files from the server and I realize that the action looks atrocious. . . .  I take full responsibility for the action but also give you the assurance that nothing was lost.  It is, indeed on the desktop of the computer as a carbon copy." *Id*. at ¶ 38.  Upon information and belief, the "final decision" Moody refers to is his decision to leave Fortiline and start his own competitive business.  *Id*. at ¶ 38.  Not all of the files referenced by Moody in his text messages were on the laptop Moody returned to Fortiline as that laptop had been wiped clean at least twice before being returned.  *Id*. at ¶ 39.

When Moody was asked to return the list of contact information for Fortiline customers he stated that it was saved on his wife's home network, which he accessed via his iPad, and he would have to ask his wife to download the list and sort out their personal contacts from his business contacts.  *Id*. at ¶ 40.  Moody eventually sent a portion of this "contact list" to Fortiline that contained only a small fraction of Fortiline's customer

information.  *Id*. at ¶ 41.  After Swedick made a second request for the contact list, Moody sent another list in which many of the contacts' telephone numbers were replaced with Moody's own telephone number.  *Id*. at ¶ 42.

### C.    Fortiline Discovers Additional Wrongdoing by Moody and Witterman

After Moody and Witterman left the company, their Fortiline e-mail inboxes were forwarded to Swedick.  *Id*. at ¶ 43.  This resulted in the discovery of e-mail threads, dating back to October 18, 2012, wherein Moody and Witterman were asking Fortiline's vendors for prices on a large project in the Bahamas, referred to as Bahama Mar.  *Id*. at ¶ 44.

On November 6, 2012, a company called Island Site Development sent an e-mail to Witterman and Moody at their Fortiline e-mail addresses requesting quotes for a project in the Bahamas - a large Water park at a resort called Bahama Mar.  *Id*. at ¶ 45.  There was no record of this request in any of Fortiline's files, indicating that Moody and Witterman were bidding on this project for their own benefit.  *Id*. at ¶ 46.

After receiving an e-mail from the contractor, addressed to Witterman's Fortiline e-mail address, Swedick forwarded it back to him to let him know Moody was gone from the company.  *Id*. at ¶ 47.  Upon information and belief, Moody was in the Bahamas meeting with this customer and other customers the day before he resigned.  *Id*. at ¶ 47.  The flight Moody took to the Bahamas to meet with these customers was paid for by Fortiline.  *Id*. at ¶ 47.  The requests for prices on the Bahama Mar project total nearly $1.5 million.  The total project could exceed $2.5 million when it is finished.  *Id*. at ¶ 48.

Upon information and belief, Moody and Witterman are taking this project for themselves and their companies, AVEM Holdings and AVEM Supply.  *Id*. at ¶ 49.  On November 14, 2012, Swedick received another e-mail sent to Moody and Witterman from

CCA Civil Bahamas, LTD.  *Id*. at ¶ 50.  CCA Civil Bahamas, LTD is a Fortiline customer with which Fortiline had done approximately $585,000 of business in 2012.  *Id*. at ¶ 51.  The November 14 e-mail sent by CCA Civil Bahamas, LTD to Moody's Fortiline e-mail sought to confirm shipment of materials.  *Id*. at ¶ 52.  There is no record of this transaction being run through Fortiline's bid system and the e-mail thread reflects Moody and Witterman communicating with CCA Civil Bahamas, LTD about the shipment beginning on November 2, 2012 – before they left Fortiline, and while being paid by Fortiline.  *Id*. at ¶ 52.

Swedick also received an e-mail from a freight company, addressed to Witterman, regarding a quote for a project in Saint Lucia – a project for which Fortiline had no record. *Id*. at ¶ 53.  Moody also re-routed Fortiline's incoming faxes so that they would be sent to his new e-mail address, rather than his Fortiline e-mail address.  *Id*. at ¶ 54.

### D.    Fortiline's Legitimate Business Interests

Fortiline has a legitimate business interest in prohibiting Moody from directly or indirectly soliciting Fortiline employees, from divulging Fortiline's Confidential Information and from disparaging Fortiline, both before and after his employment ended.  *Id*. at ¶ 55. Fortiline has made significant efforts to protect its legitimate business interests.  *Id*. at ¶ 56. Those legitimate business interests include protection of trade secrets, protection of confidential business information related to its relationships and goodwill with clients, vendors and referral sources.  *Id*. at ¶ 56.

Fortiline has suffered and will continue to suffer irreparable harm from Moody's conduct by using the Company's trade secrets and Confidential Information to hamstring Fortiline's business, resulting in the loss of at least one other employee to a competitor. Moody's actions have injured the goodwill associated with Fortiline's business and have

affected, and will continue to adversely affect, Fortiline's relationships with its clients.  *Id*. at ¶ 55.

Moody, Witterman, AVEM Supply and AVEM Holdings are direct competitors of Fortiline and, upon information and belief, have been using Fortiline's Confidential Information unlawfully to compete with Fortiline and continue to do so.  *Id*. at ¶ 57.  The use of Fortiline's confidential information by Moody, Witterman, AVEM Supply and AVEM Holdings has caused and will continue to cause irreparable harm to Fortiline.  *Id*. at ¶ 58.

Moody and Witterman knowingly, intentionally, and willfully engaged in the following conduct:

     a.    directly or indirectly soliciting Fortiline employees;

     b.    appropriating and converting for Defendant's own use and for the use of AVEM Supply and AVEM Holdings, Plaintiff's Confidential Information; and

     c.    using Plaintiff's Confidential Information for his own benefit, and for the benefit of AVEM Supply and AVEM Holdings, for purposes which might be directly or indirectly detrimental to Plaintiff; and

     d.    using Plaintiff's Confidential Information for his own benefit, and for the benefit of AVEM Supply and AVEM Holdings, to solicit Plaintiff's customers.

*Id*. at ¶ 59.  Plaintiff has suffered, and is in immediate danger of continuing to suffer, damages as a direct and proximate result of Moody's wrongful acts described above.  *Id*. at ¶ 60.  There is no adequate remedy at law that might address the irreparable injury caused by Moody's acts.  *Id*. at ¶ 60.

Plaintiff has an urgent need to prevent the unjustified interference with its business relations with its customers and employees, and to recover its confidential business and proprietary information from Defendant to conduct its business.  *Id*. at ¶ 61.  Additionally, Plaintiff has an urgent need to preclude Moody from continuing to use Plaintiff's confidential

and proprietary information, for his own benefit or for the financial benefit of AVEM Holdings and AVEM Supply. *Id.* at ¶ 62. Should Plaintiff be required to wait until a full trial on the merits to recover its confidential business and proprietary information, and for Moody to be prohibited from continuing to unlawfully use Plaintiff's trade secrets and valuable confidential business information on his own behalf and on behalf of AVEM Supply and AVEM Holdings, Fortiline will be irreparably harmed because it will continue to lose business, goodwill, and customers to Moody, Witterman, AVEM Supply and AVEM Holdings and others, which may never be recovered. *Id.* at ¶ 63.

## II.   ARGUMENT

The decision to award injunctive relief is committed to the sound discretion of the district court. *See Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir. 1990); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. King*, 804 F. Supp. 1512, 1513 (M.D. Fla. 1992). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Northeastern Fla. Ch. Of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).

A preliminary injunction is appropriate "where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotel & Resorts v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003).[3] In considering the four-part

---

[3] The standards for a temporary restraining order and preliminary injunction are virtually the same. *Emerging Vision, Inc. v. Glachman*, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010). "The primary difference between the entry of a temporary restraining order and a preliminary injunction is that a temporary restraining order may be entered before the defendant has an adequate opportunity to respond, even if notice has been provided ." *Id.*

analysis for preliminary relief, the first two elements – "substantial likelihood of prevailing" and ""substantial threat of irreparable injury" – frequently must be viewed together and evaluated together:

> The question of irreparable harm often cannot logically be considered apart from the question whether the movant is likely to success on the merits.  In many instances, the irreparable injury against which the movant seeks protection results from the infringement of a legal right or interest which will only be established definitely in the proceeding on the merits.

*Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F. 2d 560, 463 (5th Cir. 1981).[4]  Here, Fortiline has demonstrated a substantial likelihood of success on its claims against Defendants for, *inter alia*, tortious interference with business relations and misappropriation of trade secrets.

### A.  Fortiline's Confidential Information is protected under Florida law.

Florida's Uniform Trade Secrets Act (Chapter 688, Florida Statutes), protects the misappropriation (whether actual or threatened) of a company's trade secrets. Similarly, §542.335 Florida Statutes, recognizes the importance of protecting "legitimate business interests," defined as trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers or clients, customer or client goodwill, and extraordinary or specialized training.

Under Florida law, a "trade secret," means information, including a… compilation, program… or process that (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date, are binding as precedent in the Eleventh Circuit.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981).

efforts that are reasonable under the circumstances to maintain its secrecy (§688.02, Fla. Stat.).

Fortiline has demonstrated that it has "trade secrets," as defined by §688.02, Fla. Stat., and that it is justified in protecting for their misappropriation.

Under Florida law, clients' identities, relationships and goodwill are clearly "legitimate business interests," for which protection is appropriate.  *See Fulford v. Drawdy Bros. Constr., II, Inc.*, 903 So. 2d 1007, 1007 (Fla. 4th DCA 2005) (finding a legitimate business interest in customer lists); *In re Jotan, Inc*., 229 B.R. 218, 219 (M.D. Fla. 1998) (plaintiff's customer relationships and related goodwill, in addition to its confidential business information, were legitimate business interests entitled to protection). They are also be considered "trade secrets" under Florida law.  *See, e.g., Sethscot Collection, Inc. v. Drbul*, 669 So.2d 1076, 1078 (Fla. 3d DCA 1996) (confidential active customer list that contained a detailed purchasing history for each entity qualified as a trade secret entitled to injunctive protection); *Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 60 (Fla. 5th DCA 1995) (holding that confidential order edit lists are trade secrets because they reveal appellee's pricing and profit structure).

### B.  Misappropriation of Trade Secrets.

As described in detail above, Defendants have wrongfully sent, saved, used, transmitted and/or disclosed Fortiline's confidential, proprietary, and trade secret information or other property.  Pursuant to Florida's Uniform Trade Secret Act ("FUTSA"):

> Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

Fla. Stat. § 688.003(1).

Here, Defendants Moody and Witterman have engaged in the actual misappropriation of Fortiline's trade secrets.  Therefore, Fortiline is entitled to a temporary restraining order and preliminary injunction prohibiting Defendants from soliciting Fortiline's clients, vendors and referral sources, and divulging its Confidential Information based on the likelihood of success on Fortiline's claims for misappropriation of trade secrets under FUTSA.  *See Blackstone v. Dade City Osteopathic Clinic*, 511 So. 2d 1050, 1051 (Fla. 2d DCA 1987) ("A customer list may be considered a trade secret, and former employees may be prohibited from contacting their former employer's customers."); *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 935 (Fla. 2d DCA 2001) ("It is apparent that an injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests."); *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 4th DCA 1995) ("We note that conspicuously absent from this [FUTSA] statute is any requirement that the trade secret first be used before its use can be enjoined.  Clearly a threatened misappropriation of trade secrets may be enjoined."); *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 156-157 (Fla. 4th DCA 2006) (entry of a temporary injunction is appropriate enjoining the solicitation of plaintiff's customers where a former employee has committed theft of trade secrets and interfered with business relationships).

Fortiline's Confidential Information, including its client lists, is a classic example of a trade secret in that it (a) was compiled over a long period of time and at great expense to Fortiline, (b) derives independent economic value form not being generally known to the public or those that could obtain value from its disclosure or use, (c) is secured on a protected computer system, and (d) is the subject of efforts that are reasonable under the circumstances

to maintain its secrecy.  *See* Fla. Stat. § 688.002(4).     Furthermore, Defendants converted Fortiline's proprietary Confidential Information and used this information to solicit numerous clients and divert business away from Fortiline and to their own company.   Lastly, Defendants' actions in copying and deleting electronically stored Confidential Information from Fortiline's computers and servers entitles Fortiline to a presumption that more evidence of Defendants' theft and illicit use of trade secrets could have been found absent these blatant efforts to destroy evidence.

### C.  Fortiline will continue to suffer irreparable injury

Fortiline has made a substantial investment in its Confidential Information and its relationships with its existing clients, vendors and referral services.   Fortiline's specific existing and prospective clients are an important continuing source of revenue for the company, and one of the most significant legitimate business interests under Florida law. Defendants have impacted Fortiline's business to a substantial detriment and continue to do so every day they are permitted to service the clients they stole from Fortiline and to use Fortiline's Confidential Information.

Fortiline, in fact, faces permanent and irreparable harm should Defendants be permitted to persist in soliciting Fortiline's clients based on their possession and use of Fortiline's highly Confidential Information.   Indeed, Defendants are wrongfully gaining a competitive advantage over Fortiline by diverting clients and revenue away from Fortiline in and to their new companies.

A temporary restraining order and preliminary injunction is amply warranted under the facts of this case.  If left unrestrained, Defendants will continue to wrongfully compete in this narrow market, interfere with Fortiline's business, misappropriate Fortiline's business

opportunities, and use the Confidential Information they learned while in Fortiline's employ, and which they misappropriated from Fortiline, to undermine Fortiline's goodwill and relationships with clients or prospective clients.  *See Atomic Tattoos, LLC v. Morgan,* 45 So. 3d 63 (Fla. 2d DCA 2010) ("Monetary damages would be difficult to determine because the number of 'sales' lost, as well as any potential profit, would be nearly impossible to calculate, particularly with a continuing breach.").   In fact, because Moody and Witterman removed and/or destroyed Fortiline's own files, it is almost impossible for Fortiline to continue to serve its international customers or repair those relationships – Fortiline does not even have their contact information anymore.  Furthermore, this court has held that "[i]rreparable harm is presumed when use of customer lists and solicitation of customers occurs."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, 2001 U.S. Dist. LEXIS 17045, 8 (S.D. Fla. Sept. 14, 2001) (citing F.S.A. § 542.33(2)(a)).  *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1559 (S.D. Fla. 1992) ("Florida courts have repeatedly held that injunctive relief is appropriate where customer lists are involved.").

### D.  The balance of harm favors Fortiline

The balance of the harm militates heavily in favor of granting a temporary restraining order and preliminary injunction against Defendants.   Defendants have taken Fortiline's entire international business and prevented Fortiline from accessing its own records.  Defendants continue to use the Confidential Information to solicit Fortiline's clients, vendors and referral sources to Fortiline's detriment.   Fortiline should not be made to suffer from Defendants' tortious acts, as the client relationships and client goodwill it has established over many years will be significantly eroded if Defendants are permitted to continue to conduct themselves per the status quo.

Moreover, the balance of harm favors a preliminary injunction against Defendants because of the extensive revenue, business opportunities, and Confidential Information of Fortiline that Defendants have wrongfully converted to their own use. Thus, any hardship that Defendants may endure as a result of a temporary restraining order or preliminary injunction until this matter is resolved on the merits would certainly be *de minimus* by comparison, and is the result of Defendants' own wrongdoing.

In a similar case, *North American Products Corp.*, 196 F. Supp. 2d at 1231, the court found that the balance of harm favored a preliminary injunction against a former sales representative who resigned to a run a business that competed with his former employer. The former sales representative's solicitation of the employer's customers interfered with the employer's relationships with customers and had a high possibility of damaging the employer's reputation and goodwill, whereas the harm to the employee was insignificant, in that he would only be prohibited from soliciting his prior customers from the employer's business. *Id.* Such is the case here. Accordingly, this factor also favors the entry of a temporary restraining order and preliminary injunction to protect Fortiline's legitimate business interests.

### E.  Injunctive relief will not disserve the public interest.

Florida's legislature recognizes the importance of protecting legitimate business interests from interference by former employees. *See* §§ 542.33 and 542.335, *Fla. Stat.* As such, enjoining Defendants would promote the public interest, because bad actors, such as Defendants, should not be allowed to profit from their wrongdoing. Companies should be confident that the law protects their legitimate business interests, including their client

relationships and confidential business information, which are developed over years of substantial time, effort, and expense.

Indeed, "[t]he public has an interest in protecting businesses from theft of confidential information, and remedies at law are insufficient because of the time sensitive nature of confidential information and the possible advantage it could engender." *Hatfield*, 939 So. 2d at 158. Further to the analysis, because Defendants' actions are in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§1030(a)(4) and 1030(a)(5)(C). Such violations are not only civilly actionable, but also constitute criminal activity. As such, there is a much greater public interest in enforcing the law with respect to Defendants' actions.

Here, a temporary restraining order and preliminary injunction is appropriate because it would help protect Fortiline from the harm that Defendants will further inflict by gaining an unfair advantage, and preserve and protect the advancement of honest business enterprises and practices.

### F. Bond requirement

Once a court determines that a temporary restraining order or preliminary injunction should issue, Federal Rule of Civil Procedure 65(c) requires consideration of an appropriate bond. "Whether or not to require a bond in any particular case – and the amount of any such bond demanded – is within the discretion of the trial judge." *Univ. Books & Videos, Inc. v. Metro. Dade County*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999) (noting that security generally is not required when the party seeking the injunction has a high probability of succeeding on the merits of its claim); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("the amount of security

required by the rule is a matter within the discretion of the trial court . . . [and] the court may elect to require no security at all").

In the instant case, Fortiline has demonstrated a high likelihood of success on its motion for entry of temporary restraining order and preliminary injunction. The facts here, including Defendants' certain awareness of Fortiline's rights, and Defendants' decision to move forward with their schemes despite their knowledge of the potential consequences, all weigh against entry of a substantial bond. Accordingly, Fortiline requests this Court issue a temporary restraining order and a preliminary injunction requiring a security of not more than $1,000.00.

## III.    CONCLUSION

Based on the foregoing, Fortiline has established its need for the immediate issuance of a temporary restraining order and preliminary injunction prohibiting Defendants from continuing to benefit from their wrongful acts. Accordingly, Fortiline respectfully requests that this Court enter a temporary restraining order and then immediately set this matter for a hearing to determine the necessity of an award of a preliminary injunction to prevent any further irreparable injury to Fortiline.

Respectfully submitted this 6th day of December, 2012 by:

/s/Amanda E. Ballard, Esq.
William E. Grob, Esq.
Florida Bar. No. 0463124
E-mail: william.grob@ogletreedeakins.com
J. Robert McCormack, Esq.
Florida Bar No.: 864791
E-mail: robert.mccormack@ogletreedeakins.com
Amanda E. Ballard, Esq.
Florida Bar No. 28808
E-mail: mandi.ballard@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.

100 North Tampa Street, Suite 3600
Tampa, Florida 33602
Telephone:  (813) 289-1247
Facsimile:  (813) 289-6530
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on this 6th day of December, 2012, a true and correct copy of the foregoing will be served by certified U.S. Mail, return receipt requested, on all parties on the Service List below.

*/s/Amanda E, Ballard, Esq.*
Attorney

## SERVICE LIST

AVEM SUPPLY, LLC
C/O ITS REGISTERED AGENT
DANIEL B. MOODY
1003 JUPITER PARK LANE #2
JUPITER, FL 33458

AVEM HOLDINGS, LLC
C/O ITS REGISTERED AGENT
CARRIE E. MOODY
18199 APRIL LANE
JUPITER, FL 33458

DANIEL B. MOODY
18199 APRIL LANE
JUPITER, FL  33458

TODD J. WITTERMAN
645 SW ANDROS CIRCLE
PORT ST. LUCIE, FL  34986